PRESENT:  All the Justices

JONATHAN R. CLARK

v.  Record No. 151857

OPINION BY
JUSTICE D. ARTHUR KELSEY
December 1, 2016

VIRGINIA DEPARTMENT OF STATE POLICE

FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
Lynn S. Brice, Judge

A 1998 amendment to the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), *see* 38 U.S.C. §§ 4301-4335, created a private right of action enforceable against States in their own courts, *see* 38 U.S.C. § 4323(b)(2).  In this case, the trial court held that principles of sovereign immunity barred a USERRA suit filed by Jonathan R. Clark against the Virginia Department of State Police ("VSP"), an arm of the Commonwealth.  We agree and affirm.

I.

Clark filed a USERRA claim against the VSP, alleging that he was denied a promotion because of his service in the United States Army Reserves.  The VSP responded with a plea of sovereign immunity.  As an agency of the Commonwealth, the VSP argued that it could not be sued on a federal right of action in state court absent a waiver of sovereign immunity.  Neither it nor the General Assembly, the VSP asserted, had waived sovereign immunity for USERRA claims filed in state court.  The trial court agreed, granted the plea of sovereign immunity, and dismissed Clark's USERRA claim.

II.

On appeal, Clark contends that the trial court misapplied sovereign-immunity principles and thus erred in dismissing his USERRA claim.  The United States, appearing as amicus, concurs with Clark and urges us to hold that the Commonwealth's sovereign immunity has been

lawfully abrogated by 38 U.S.C. § 4323(b)(2). The VSP responds that the trial court correctly applied sovereign-immunity principles and had no choice but to dismiss the USERRA action. We hold that the trial court properly dismissed Clark's USERRA claim based upon the Commonwealth's sovereign immunity.[1]

A.

"Dual sovereignty is a defining feature of our Nation's constitutional blueprint." *Sossamon v. Texas*, 563 U.S. 277, 283 (2011) (citation omitted). "Upon ratification of the Constitution, the States entered the Union 'with their sovereignty intact.'" *Id.* (citation omitted). Federalism presupposes that the States retain exclusive sovereignty in some aspects of governance, share sovereign power with the federal government in other aspects, and yield their sovereign power only in those aspects of governance exclusively assigned to the federal government by the United States Constitution. *See generally Blatchford v. Native Vill. of Noatak*, 501 U.S. 775, 779 (1991) (collecting cases).

---

[1] Virginia law authorizes a statutory right of action in nearly identical circumstances as the federal USERRA. *See* Code § 44-93.5 (permitting military personnel suffering employer violations of Code §§ 44-93 to -93.4 to bring suit in circuit court and authorizing the Attorney General to represent such persons upon request); *see also* Code §§ 44-93(A) & -93.1(A) (entitling military personnel employed by the Commonwealth to leaves of absence for service without penalty, health insurance and benefits throughout service, and equivalent pay and seniority upon return from service).

Clark did not assert any claims against the VSP based upon Virginia law, arguing that relief under Virginia law is "specious" because "[w]hile [Code §] 44-93.4 is modeled on USERRA, this state statute applies only to Virginia guard forces [and] does not apply to [appellant]," a member of the U.S. Army Reserves. Reply Br. at 3-4. *But see* Code § 44-93(A) (referring to "members of the organized reserve forces of any of the armed services of the United States"). In any event, because Clark did not assert any Virginia law claims, we do not address his entitlement to relief as an army reservist under Code § 44-93.5 or any other applicable provisions of Virginia law. *See Commonwealth v. Harley*, 256 Va. 216, 219-20, 504 S.E.2d 852, 854 (1998) ("[C]ourts are not constituted to render advisory opinions, to decide moot questions, or to answer inquiries which are merely speculative.") (alteration omitted) (quoting *City of Fairfax v. Shanklin*, 205 Va. 227, 229-30, 135 S.E.2d 773, 775-76 (1964)).

2

Under the Constitution's segmentation of governmental power, States retain "a residuary and inviolable sovereignty" that precludes them from being "relegated to the role of mere provinces or political corporations" of a consolidated national government. *Alden v. Maine*, 527 U.S. 706, 715 (1999) (first quote from The Federalist No. 39, at 245 (J. Madison) (C. Rossiter ed., 1961)). As James Madison explained, States possess "distinct and independent portions of the supremacy, no more subject, within their respective spheres, to the general authority than the general authority is subject to them, within its own sphere." *Id.* at 714 (quoting The Federalist No. 39, at 245).

From the beginning of the Republic, the doctrine of state sovereign immunity has been a mainstay of federalism principles. It was an axiom of English law that "the law ascribes to the king the attribute of sovereignty," and thus, "no court can have jurisdiction over him" because "jurisdiction implies superiority of power." 1 William Blackstone, Commentaries *241-42. "Immunity from private suits has long been considered 'central to sovereign dignity.'" *Sossamon*, 563 U.S. at 283 (citation omitted). Based on that tradition, "[t]he generation that designed and adopted our federal system considered immunity from private suits central to sovereign dignity." *Alden*, 527 U.S. at 715.

Alexander Hamilton considered it "inherent in the nature of sovereignty" for a state "not to be amenable to the suit of an individual *without its consent*." The Federalist No. 81, at 487 (A. Hamilton). "This is the general sense and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every State in Union." *Id.* Speaking at the Virginia ratifying convention, James Madison agreed: "It is not in the power of individuals to call any state into court." 3 Jonathan Elliot, The Debates in the Several State Conventions on the Adoption of the Federal Constitution 533 (1827). John

Marshall concurred, "It is not rational to suppose that the sovereign power [i.e., a State] should be dragged before a court." *Id.* at 555.

In 1793, roughly five years after the ratification of the Constitution, a South Carolinian filed suit in the United States Supreme Court against the State of Georgia seeking payment of a debt incurred during the American Revolution. In that case, *Chisholm v. Georgia*, 2 U.S. 419 (1793), Georgia protested that the federal judicial power in Article III did not abrogate States' sovereign immunity. "The suability of a State without its consent," Georgia no doubt assumed, "was a thing unknown to the law." *Hans v. Louisiana*, 134 U.S. 1, 16 (1890). A majority of Justices on the Supreme Court disagreed, holding that Article III implicitly abolished state sovereign immunity by affirmatively granting federal courts the power to decide disputes between private citizens and States. *See Chisholm*, 2 U.S. at 452, 466, 467.[2]

Georgia's representatives were none too pleased. The day after the opinion was issued, the Georgia congressional delegation introduced a resolution in Congress that, while initially unsuccessful, would later become the Eleventh Amendment. *See Alden*, 527 U.S. at 721. Clarifying its views with further emphasis, the Georgia House of Representatives passed a bill stating that anyone who attempted to enforce *Chisholm* would be "guilty of felony and shall suffer death, without benefit of clergy, by being hanged." *Id.* at 720-21 (citation omitted). Within a year, the Eleventh Amendment passed Congress with near unanimity and was swiftly ratified by the States. *Chisholm*, an opinion that "fell upon the country with a profound shock,"

---

[2] Following the tradition of English jurists, *see* William H. Rehnquist, The Supreme Court 40 (2d ed. 2001), the *Chisholm* Justices issued individual opinions in seriatim in ascending order of seniority. Chief Justice Marshall is credited with ending this practice, *see* M. Todd Henderson, From Seriatim to Consensus and Back Again: A Theory of Dissent, 2007 Sup. Ct. Rev. 283, 313-15 (2007), much to the consternation of Thomas Jefferson, *see* Letter from Thomas Jefferson to Judge Johnson (March 4, 1823), *in* 7 The Writings of Thomas Jefferson 276, 278 (H.A. Washington ed., 1854); *see generally* Letter from Thomas Jefferson to Judge Johnson (June 12, 1823), *in id.* at 290, 298.

*id.* at 720 (citation omitted), had one of the shortest tenures of any opinion ever issued by the Supreme Court.

Addressing only the *Chisholm* scenario, the literal text of the Eleventh Amendment limited only the "Judicial power of the United States" (the jurisdiction of Article III federal courts) and prohibited only suits against a State "by Citizens of another State" or citizens or subjects of a foreign state. U.S. Const. amend. XI. More than 200 years of precedent, however, has mined "history and experience" as well as "the established order of things," *Hans*, 134 U.S. at 14, to rediscover the "background principle" animating the Eleventh Amendment, that Congress may not authorize "suits by private parties against unconsenting States." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 72 (1996).

That background principle received full recognition in *Alden v. Maine*. In that case, a group of Maine probation officers filed suit in a Maine state court alleging that their employer, the State of Maine, had violated overtime pay provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219. The Act purported to authorize private actions against States in their own courts. *Id.* §§ 203(x), 216(b). The holding of *Alden* was emphatic: "We hold that the powers delegated to Congress under Article I of the United States Constitution do not include the power to subject nonconsenting States to private suits for damages in state courts." 527 U.S. at 712. Put differently, but no less unequivocally: "In light of history, practice, precedent, and the structure of the Constitution, we hold that the States retain immunity from private suit in their own courts, an immunity beyond the congressional power to abrogate by Article I legislation." *Id.* at 754. Given "the historical record," the Supreme Court observed, "it is difficult to conceive that the Constitution would have been adopted if it had been understood to strip the States of

5

immunity from suit in their own courts and to cede to the Federal Government a power to subject nonconsenting States to private suits in these fora." *Id.* at 743.[3]

*Alden* clarified that this form of "sovereign immunity derives not from the Eleventh Amendment but from the structure of the original Constitution itself" and the "fundamental postulates implicit in the constitutional design." *Id.* at 728-29. Judicial recognition of the "contours of sovereign immunity" necessarily must be "determined by the founders' understanding" of the constitutional design. *Id.* at 734. To rule otherwise, the Supreme Court explained, would endorse "the type of ahistorical literalism" employed by the "discredited decision in *Chisholm*." *Id.* at 730.

B.

The enduring role of sovereign immunity is not without its qualifications. It generally does not apply, for example, to suits filed in federal court seeking prospective relief against a continuing violation of federal law by state officers, *Ex parte Young*, 209 U.S. 123, 155-56 (1908),[4] or cases that seek to enforce civil rights laws enacted pursuant to Section 5 of the Fourteenth Amendment, *Coleman v. Court of Appeals of Maryland*, 566 U.S. 30, ___, 132 S. Ct.

---

[3] Clark concedes that the Commonwealth is "nonconsenting," *Alden*, 527 U.S. at 712, in the sense that it did not waive any sovereign immunity it might have in this case, *see generally Sossamon*, 563 U.S. at 284-85 ("Accordingly, 'our test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one.' A State's consent to suit must be 'unequivocally expressed' in the text of the relevant statute. Only by requiring this 'clear declaration' by the State can we be 'certain that the State in fact consents to suit.' Waiver may not be implied. For these reasons, a waiver of sovereign immunity 'will be strictly construed, in terms of its scope, in favor of the sovereign.'" (citations omitted)).

[4] Even this qualification has its own caveats. "The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. ___, ___, 135 S. Ct. 1378, 1385 (2015). Because of these limitations, *Ex parte Young* is a "narrow exception" to sovereign immunity, *Seminole Tribe*, 517 U.S. at 76, and is "narrowly construed," *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 114 n.25 (1984), *superseded on other grounds by statute*, 28 U.S.C. § 1367.

1327, 1333 (2012) (plurality opinion); *Seminole Tribe*, 517 U.S. at 59. Nor does sovereign immunity apply when the United States, rather than a private citizen, brings an action in federal court against a State. *See Alden*, 527 U.S. at 755 (citing *Principality of Monaco v. Mississippi*, 292 U.S. 313, 328-39 (1934)).

The *Alden* plaintiffs asserted their claims under the FLSA. The Congressional power to enact the FLSA arose from the Commerce Clause in Article I, Section 8. *Seminole Tribe* held that Congress's "Article I authority to regulate commerce" does not include the power to "abrogate a State's immunity" to suit in federal court. *Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254 n.2 (2011) (citing *Seminole Tribe*, 517 U.S. at 65-66); *see also Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank*, 527 U.S. 627, 636 (1999) (holding that "Congress may not abrogate state sovereign immunity pursuant to its Article I powers," including "either the Commerce Clause or the Patent Clause"). *Alden* applied this principle to suits in state court. The "logic" of sovereign immunity, *Alden* reasoned, "extends to state-court suits as well." *Alden*, 527 U.S. at 733.

The only exception recognized to the general rule of sovereign immunity arises in the sui generis context of federal bankruptcy litigation. Because "[b]ankruptcy jurisdiction, at its core, is *in rem*," the United States Supreme Court held that "it does not implicate States' sovereignty to nearly the same degree as other kinds of jurisdiction. That was as true in the 18th century as it is today." *Central Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 362 (2006) (citation omitted). Unlike the constitutional history of other Article I, Section 8 powers, the "history of the Bankruptcy Clause, the reasons it was inserted in the Constitution, and the legislation both proposed and enacted under its auspices immediately following ratification of the Constitution" show that the Founders intended it "not just as a grant of legislative authority to Congress, but also to authorize

7

limited subordination of state sovereign immunity in the bankruptcy arena." *Id.* at 362-63. "In ratifying the Bankruptcy Clause," *Katz* held, "the States acquiesced in a subordination of whatever sovereign immunity they might otherwise have asserted in proceedings necessary to effectuate the *in rem* jurisdiction of the bankruptcy courts." *Id.* at 378.

C.

Clark argues that USERRA should be exempt from the general sovereign-immunity rule of *Alden* and be treated, as the bankruptcy power was in *Katz*, as an exceptional, but nonetheless valid, congressional abrogation of the Commonwealth's sovereign immunity to suits in its own courts. In support, Clark points out that Congress enacted USERRA pursuant to its grant of war powers in Article I, Section 8, Clauses 11-16,[5] not its power to "regulate Commerce . . . among the several States" under Article I, Section 8, Clause 3, which authorized the Act addressed in *Alden*. For several reasons, we find this to be a distinction without a difference.

To begin with, neither the reasoning nor the holding of *Alden* addressed — much less turned on — the fact that the offending federal statute, the FLSA, was enacted pursuant to the Commerce Clause. *See* U.S. Const. art. I, § 8, cl. 3. As noted earlier, the Supreme Court made clear in *Alden* that its sovereign-immunity holding encompassed all congressional powers recognized in Article I not just the power over interstate commerce. "We hold that the *powers delegated to Congress under Article I* of the United States Constitution do not include the power

---

[5] *See* 144 Cong. Rec. H1396, H1398 (daily ed. March 24, 1998) (statement of Rep. Evans) (noting that "the authority for laws involving veterans['] benefits is derived from the War Powers clause"). *Compare* 20 C.F.R. § 1002.2 (2016) (describing USERRA as "the latest in a series of laws protecting veterans' employment and reemployment rights going back to the Selective Training and Service Act of 1940" with its "immediate predecessor" being the Veterans' Reemployment Rights Act (VRRA), former 38 U.S.C. §§ 2021-2027 (1988)), *with United States v. Nugent*, 346 U.S. 1, 9 (1953) (describing the Selective Service Act as "a valid exercise of the war power"); *Reopell v. Massachusetts*, 936 F.2d 12, 15-16 (1st Cir. 1991) (noting that Congress enacted the VRRA pursuant to its war powers); *Peel v. Florida Dep't of Transp.*, 600 F.2d 1070, 1072 (5th Cir. 1979) (same).

to subject nonconsenting States to private suits for damages *in state courts*."  *Alden*, 527 U.S. at 712 (emphases added).

Relying exclusively on the "history, practice, precedent, and the structure of the Constitution," not the literal text or unique context of the Commerce Clause, the Court "h[e]ld that the States retain immunity from private suit *in their own courts*, an immunity beyond the congressional power to *abrogate by Article I legislation*."  *Id.* at 754 (emphases added); *accord Florida Prepaid*, 527 U.S. at 636 (recognizing that "Congress may not abrogate state sovereign immunity pursuant to its Article I powers," including the Patent and Copyright Clause).

In reply, Clark describes *Katz* as an exception to *Alden*'s broad, unqualified holding. After all, Clark correctly asserts, the congressional abrogation of sovereign immunity in *Katz* was authorized by the Bankruptcy Clause — an Article I power found in Section 8, Clause 4. We appreciate the point (as did the four dissenting Justices in *Katz*) but are unpersuaded that it matters in Clark's case.  Two aspects of *Katz* foreclose Clark's view that *Alden* either has been or should be picked apart by further exceptions.

First, *Katz* involved claims against States filed exclusively in federal bankruptcy court. In contrast, the broad, unqualified holding of *Alden* addressed claims against States "in their own courts."  *See Alden*, 527 U.S. at 730, 742-43.  No portion of *Katz* took issue with *Alden's* recognition of a State's sovereign immunity in its own courts.  Moreover, *Katz* involved a unique body of law governing "*in rem*" rights to bankrupt estates and the historic power of bankruptcy courts "to issue ancillary orders enforcing their *in rem* adjudications."  *Katz*, 546 U.S. at 370.  *In rem* actions do "not implicate States' sovereignty to nearly the same degree as other kinds of jurisdiction."  *Id.* at 362.  *Alden* did not involve *in rem* proceedings, but rather *in personam* rights of action.  The *Alden* holding, therefore, was not limited — much less implicitly overruled — by

9

*Katz*. The former addressed federal claims against States in their own courts asserting *in personam* rights of action. The latter addressed federal claims against States in federal bankruptcy courts asserting *in rem* claims and ancillary remedies.

It could very well be, as Clark surmises, that *Alden*'s trajectory may eventually be redrawn by the United States Supreme Court and that the future effort may characterize *Katz* as the first necessary course correction.[6] We offer no views on the subject because that task, if it

---

[6] That said, since *Katz*, no court has affirmatively held that Congress's war powers may abrogate the sovereign immunity of States without their express consent. *See, e.g.*, *United States v. Alabama Dep't of Mental Health & Mental Retardation*, 673 F.3d 1320, 1324 (11th Cir. 2012) (noting that if a private citizen had been the plaintiff, "it is undisputed that sovereign immunity would have barred his [USERRA] suit because a State cannot be sued [in federal court] by an individual without its consent"); *Townsend v. University of Alaska*, 543 F.3d 478, 484 n.2 (9th Cir. 2008) ("Congress did not use the terms 'must' or 'shall' with respect to state court jurisdiction over USERRA claims" because "the powers delegated to Congress under Article I of the United States Constitution [including the war powers] do not include the power to subject nonconsenting States to private suits for damages in state courts." (quoting *Alden*, 527 U.S. at 712)); *Risner v. Ohio Dep't of Rehab. & Corr.*, 577 F. Supp. 2d 953, 964 (N.D. Ohio 2008) (reasoning that the war powers are conferred by Article I, which *Seminole Tribe* made clear "cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction" (citation omitted)); *Janowski v. Division of State Police*, 981 A.2d 1166, 1170 (Del. 2009) (holding that "[USERRA] could not abrogate state sovereign immunity, because Congress passed that law pursuant to its Article I, Section 8 war powers"); *Anstadt v. Board of Regents of the Univ. Sys. of Ga.*, 693 S.E.2d 868, 871 & n.14 (Ga. Ct. App. 2010) (finding appellant's contention that "the enactment of USERRA abrogated the state's sovereign immunity because it was enacted pursuant to Congress's war powers [was] unavailing" on the authority of *Alden*, 527 U.S. at 712, and *Seminole Tribe*, 517 U.S. at 59-60); *Ramirez v. State Children, Youth & Families Dep't*, 372 P.3d 497, 499-500, 503 (N.M. 2016) (noting that "Congress created USERRA pursuant to its War Powers" and that in *Seminole Tribe* "the Supreme Court rejected Congress's authority under the powers granted by Article I . . . to abrogate a state's sovereign immunity," but ultimately not deciding the constitutional question because the state had waived immunity); *Smith v. Tennessee Nat'l Guard*, 387 S.W.3d 570, 574 (Tenn. Ct. App. 2012) (holding that "for an individual to sustain an action against a state pursuant to USERRA, the action must be permitted by state law" because USERRA's jurisdictional statute directs private claims against states to state courts "in accordance with the laws of the State" (quoting 38 U.S.C. § 4323(b)(2))).

Prior to *Katz*, most courts to consider the issue opined that Congress's Article I war powers did not authorize the abrogation of state sovereign immunity. *See, e.g.*, *Ysleta del sur Pueblo v. Raney*, 199 F.3d 281, 288 (5th Cir. 2000); *Velasquez v. Frapwell*, 160 F.3d 389, 395 (7th Cir. 1998), *vacated on other grounds*, 165 F.3d 593 (7th Cir. 1999) (per curiam); *Sacred*

should be undertaken at all, is not ours to take.  For us, it is enough that *Alden*'s holding was unqualified:  Nonconsenting States cannot be forced to defend "private suits" seeking *in personam* remedies "in their own courts" based upon "the *powers delegated to Congress under Article I* of the United States Constitution."  *Alden*, 527 U.S. at 712, 754 (emphasis added).  We thus accept it at face value that sovereign immunity is simply "beyond the congressional power to abrogate by Article I legislation" under these circumstances.  *Id.* at 754.

Clark not so subtly implies that we should recognize *Katz* as the first in a series of retrenchments that he predicts the United States Supreme Court will make from the broad holding of *Alden*.  *See* Appellant's Br. at 11-12.  We neither affirm nor disaffirm Clark's prediction.  To us, the question is what the law is now, not what it may be in the future.  We are not in the speculative business of plotting the future course of federal precedents.[7]  And we take some comfort in knowing that the United States Supreme Court is no more interested in our doing so than we are.  "[O]ther courts," the Supreme Court has said, should not "conclude our more recent cases have, by implication, overruled an earlier precedent."  *Agostini v. Felton*, 521 U.S. 203, 237 (1997).  Instead, "if a precedent of this Court has direct application in a case, yet

---

*Heart Hosp. v. Pennsylvania Dep't of Pub. Welfare*, 133 F.3d 237, 245 (3d Cir. 1998); *Rotman v. Board of Trs. of Mich. State Univ.*, 1997 U.S. Dist. LEXIS 10754, at *5-7 (W.D. Mich. June 19, 1997) (unpublished); *Larkins v. Department of Mental Health & Mental Retardation*, 806 So.2d 358, 363 (Ala. 2001).  Other courts, however, held differing views.  *See, e.g.*, *Diaz-Gandia v. Dapena-Thompson*, 90 F.3d 609, 616 & n.9 (1st Cir. 1996); *Reopell*, 936 F.2d at 16; *Peel*, 600 F.2d at 1081; *Jennings v. Illinois Office of Educ.*, 589 F.2d 935, 937-38 (7th Cir. 1979); *Camacho v. Public Serv. Comm'n of P.R.*, 450 F. Supp. 231, 234-35 (D.P.R. 1978).

[7] Given the breadth of the holding in *Alden* and the narrowness of the exception recognized in *Katz*, we need not address in any detail Clark's historical argument about the breadth of the Congressional war powers.  Nor is it necessary, for that matter, to accept or refute the Solicitor General's rejoinder that none of Clark's historical sources specifically address waiver of sovereign immunity in the war powers context and that Congress first thought of doing so in 1974, *see* Vietnam Era Veterans' Readjustment Assistance Act of 1974, Pub. L. No. 93-508, 88 Stat. 1596, nearly two centuries after the ratification of the Constitution.  *See generally* Appellee's Br. at 5.

appears to rest on reasons rejected in some other line of decisions, [lower courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Id.* (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)).

### III.

In sum, the trial court correctly held that sovereign immunity barred Clark's USERRA claim against the VSP, an arm of the Commonwealth, because "the powers delegated to Congress under Article I of the United States Constitution do not include the power to subject nonconsenting States to private suits for damages in state courts." *Alden*, 527 U.S. at 712; *id.* at 754 (repeating the opinion's "we hold" declaration). The *Katz* qualification, applicable only to claims arising within a federal bankruptcy court's *in rem* jurisdiction over a bankruptcy estate, does not apply to Clark's state-court claim for *in personam* damages. Therefore, the trial court did not err in dismissing Clark's suit on the basis of sovereign immunity.

*Affirmed.*